STATE OF CONNECTICUT *v.* SCOTT WILLIAM FORREST
(13688)

PETERS, C. J., SHEA, GLASS, COVELLO and BORDEN, Js.

Argued June 6—decision released August 7, 1990

*Bruce A. Sturman,* public defender, for the appellant (defendant).

*C. Robert Satti, Sr.,* state's attorney, with whom was *Marcia A. Pillsbury,* assistant state's attorney, for the appellee (state).

GLASS, J. The defendant, Scott Forrest, has appealed from his judgment of conviction by a jury of the crime of murder in violation of General Statutes § 53a-54a,[1] for which the trial court sentenced him to a term of life imprisonment. On appeal, the defendant raises the sole issue of whether the trial court should not have

---

[1] "[General Statutes] Sec. 53a-54a. MURDER DEFINED. AFFIRMATIVE DEFENSES. EVIDENCE OF MENTAL CONDITION. CLASSIFICATION. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the

overruled his objections to the so-called "policeman at the elbow" questions that the state asked his expert witness on cross-examination. He claims that these questions elicited opinions from the expert regarding ultimate issues of fact reserved for the jury, in violation of General Statutes § 54-86i,[2] as well as in contravention of the trial court's prior ruling on the state's motion in limine.[3] We affirm the judgment of the trial court.

The murder charge against the defendant arose from his admitted shooting of Sheila Ann Kelly, his former girlfriend. In November, 1987, Kelly purportedly attempted to terminate her relationship with the defendant, who had a history of psychological problems, including a suicide attempt. Kelly nonetheless attended a Christmas party with the defendant on December 4,

---

reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a), on the question of whether the defendant acted with intent to cause the death of another person.

"(c) Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony."

[2] "[General Statutes] Sec. 54-86i. TESTIMONY OF EXPERT WITNESS RE MENTAL STATE OR CONDITION OF DEFENDANT. No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto, except that such expert witness may state his diagnosis of the mental state or condition of the defendant. The ultimate issue as to whether the defendant was criminally responsible for the crime charged is a matter for the trier of fact alone."

[3] The state also claims that the trial court should not have: (1) denied its motion for discovery of materials upon which the defendant's expert based his psychiatric report; and (2) refused to permit it to call the defendant's investigator as a rebuttal witness. Since we affirm the judgment of the trial court, we need not address these claims.

1987. After the party, the defendant and Kelly went to his grandparents' house, where the defendant then lived, and engaged in sexual intercourse in the defendant's room. Kelly thereafter told the defendant not to believe that they would get back together just because they had sexual relations that night. When the defendant was driving Kelly home, he became angry, stopped his car in a secluded area, and removed a rifle from the trunk of the car, allegedly intending to commit suicide. He then went to the front of the car and shot Kelly in the head three times.

The principal issue at trial was whether the defendant specifically intended to kill Kelly as alleged by the state, or rather killed Kelly while under the influence of extreme emotional disturbance as the defendant claimed in an affirmative defense pursuant to § 53a-54a. Prior to the presentation of the defendant's case, the state filed a motion in limine requesting a ruling that the defense experts be prohibited, under § 54-86i, from expressing "an opinion or inference as to whether the defendant was under the influence of an extreme emotional disturbance at the time of the acts alleged in the information." After defense counsel agreed with the trial court's statement that § 54-86i prevented the parties from seeking an "opinion or inference as to whether the defendant was under the influence of an extreme emotional disturbance at the time of the alleged act," the trial court granted the state's motion in limine.

Subsequently, the defendant called an expert witness, Kenneth Selig, a psychiatrist, to testify as to his diagnosis of the defendant's mental condition. Without objection by the state, defense counsel asked Selig if he had an opinion whether at the time of the shooting the defendant suffered "from a mental disease or defect that would rise to the level of insanity under our [p]enal [c]ode," to which Selig answered that in his opinion the

defendant did not. The state then requested that the jury be excused, and expressed its concern to the trial court that the defense would next ask Selig, in violation of § 54-86i, whether the defendant had a mental disease or defect that rose to the level of extreme emotional disturbance. The state argued that Selig might "respond . . . by saying [the defendant] lost control . . . . Now, those are issues for the jury to determine whether or not he could control himself in this particular instance. . . . I do not think he can say it would cause [the defendant] to [lose] control . . . [b]ecause that is an essential part of extreme emotional disturbance . . . because that is a part of the definition of extreme emotional disturbance." The trial court, rather than expressing agreement with the state's interpretation of § 54-86i, noted that "the ultimate question here, the element is whether it is extreme emotional [disturbance]," and permitted the state to voir dire Selig in order to resolve the state's doubts.

After a voir dire of Selig, in the jury's absence, satisfied the state that his testimony would fall within the permissible bounds of § 54-86i, Selig testified further on direct examination that as a result of the defendant's break-up with Kelly, "[the defendant] was devastated. His world was shattered. He was enraged, despondent, felt hopeless, felt that he couldn't go on, felt that life wasn't worth living without her." Upon cross-examination of Selig, the following colloquy then took place:

"[State's Attorney]: Okay. Doctor . . . . Do you think if there was a policeman in that secluded area, standing there and then [the defendant] drove in with his headlights [on] and saw the policeman there, do you think that he would have gone to the back of the car and gotten the gun and walked over to the side of the car and shot . . . Kelly?

"[Defense Counsel]: Objection. Relevance.

"[State's Attorney]: Claim it. It deals with mental state, if Your Honor please.

"[Defense Counsel]: Relevance?

"[State's Attorney]: It deals with mental state.

"[The Court]: I'll allow it.

"[Defense Counsel]: Exception.

"[The Court]: Exception is noted. Can you answer the question Doctor?

\* \* \*

"[Dr. Selig]: . . . I haven't thought about it yet. I could give it some thought right now if you would like. . . .

"[State's Attorney]: No . . . Then I gather as you sit there right now, you do not have an opinion that he would have shot her even if there was a policeman standing there. Is that true?

"[Dr. Selig]: That's correct.

"[State's Attorney]: Let's forget the policeman in uniform. . . . Supposing there was another couple in the car there making love or right close by, would he have drove up close by and parked his car and gone to the trunk and gotten his rifle, his loaded .22 rifle and gone to the side of the car and shot . . . Kelly through the head twice?

"[Defense Counsel]: Same objection.

"[State's Attorney]: Claim it, if Your Honor please.

"[The Court]: I'll allow it.

"[Defense Counsel]: Exception, please, Judge.

"[State's Attorney]: Do you have an opinion on that, Doctor?

\* \* \*

"[Dr. Selig]: I think that that would have been sufficient to have stopped him.

"[State's Attorney]: Okay. Now, Doctor . . . why did you think so long about that? . . .

"[Dr. Selig]: I think it's an extremely important question. . . . I gave a different amount of thought to that [than] I would have in a different case. And I, in order to reflect on it, part of what I needed to consider was [the defendant's] susceptibility to structure and authority. And I think that generally with authority figures, he attempted to behave appropriately. And that given that degree of structure, it probably would have stopped him. I needed to consider those things.

\* \* \*

"[State's Attorney]: Now, in responding just a moment ago, I believe I heard you say that he reacts to authority figures. I think my second question said, suppose there is another couple in the car nearby. I want to ask you, do you consider another couple in a car to be authority figures?

"[Dr. Selig]: And the policeman. And I would change my answer to that.

"[State's Attorney]: You would change your answer to the policeman?

"[Dr. Selig]: Yes, I would.

"[State's Attorney]: All right, tell us how you would change your answer.

"[Dr. Selig]: That he, a policeman being there probably would stop him."

It is this exchange that the defendant claims violated the proscriptions of § 54-86i, as well as the trial court's ruling on the state's motion in limine. Furthermore, the defendant contends that the harm resulting from the exchange is apparent from the state's reduction of its case down to Selig's answers by referring the jury to Selig's answers in closing argument and stating "[t]hat's the whole case."

I

We note first that the defendant, by objecting to the state's questions on relevancy grounds, failed to preserve properly the issue he has raised on appeal. Practice Book § 4185 requires that appealable claims of error be distinctly raised at trial. See also Practice Book § 288; *State* v. *Weidenhof,* 205 Conn. 262, 273, 533 A.2d 545 (1987). Nor is the defendant entitled to *Evans* review of this issue, for the admissibility of expert opinion testimony is a matter of state evidentiary law, rather than a matter of constitutional significance. See *State* v. *Smith,* 209 Conn. 423, 426, 551 A.2d 742 (1988); *State* v. *Vilalastra,* 207 Conn. 35, 46–47, 540 A.2d 42 (1988); *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973). Since the defendant's claim is not "of constitutional magnitude alleging the violation of a fundamental right"; *State* v. *Golding,* 213 Conn. 233, 239, 567 A.2d 823 (1989); one of the four preconditions to *Evans* review, his claim to *Evans* review is without merit. See id., 239–40. Because the parties have raised and briefed a single issue on appeal, and the record in this case provides an adequate basis for appellate review, we nonetheless exercise our discretion and review the defendant's claim.[4]

II

" 'The true test for the admissibility of expert testimony is "whether the witnesses offered as experts have

---

[4] We summarily dispose of that portion of the defendant's claim that the trial court contravened its prior ruling on the state's motion in limine when it overruled the defendant's objections to the state's subsequent questions. The trial court's ruling, as noted, merely precluded the parties from seeking direct expert opinion as to whether the defendant suffered from extreme emotional disturbance. Therefore, we do not agree with the defendant's contention that the element of control was foreclosed from the jury's consideration by the court's granting of the state's motion in limine. The question of control arose later in the trial and an examination of the record reveals that the trial court never expressly ruled inadmissible expert opinion testimony regarding the defendant's capacity for self-control.

any peculiar knowledge or experience, not common to the world, which renders their opinions founded on such knowledge or experience any aid to the court or the jury in determining the question at issue." ' *Schomer* v. *Shilepsky,* 169 Conn. 186, 191, 363 A.2d 128 (1975), quoting *Taylor* v. *Monroe,* 43 Conn. 36, 44 (1875). . . . 'Generally, expert testimony may be admitted if the witness has a special skill or knowledge, beyond the ken of the average juror, that, as properly applied, would be helpful to the determination of an ultimate issue.' *Siladi* v. *McNamara,* 164 Conn. 510, 513, 325 A.2d 277 (1973)." *State* v. *Palmer,* 196 Conn. 157, 166, 491 A.2d 1075 (1985). The trial court has broad discretion in applying these concepts and in ruling on the admissibility of expert opinions. See *State* v. *Rodgers,* 207 Conn. 646, 651, 542 A.2d 1136 (1988); *State* v. *Kemp,* 199 Conn. 473, 476, 507 A.2d 1387 (1986). "The exercise of such discretion is not to be disturbed unless it has been abused or the error is clear and involves a misconception of the law." *State* v. *Douglas,* 203 Conn. 445, 452, 525 A.2d 101 (1987).

The defendant claims, as noted, that the state's questions and Selig's answers regarding the defendant's ability to control himself in a hypothetical situation violated § 54-86i. In support of his claim, the defendant first notes that in order to prevail on his affirmative defense of extreme emotional disturbance, the trier of fact must find: (1) the emotional disturbance is not a mental disease or defect that rises to the level of insanity as defined by the penal code; (2) the defendant was exposed to an extremely unusual and overwhelming state, that is, not mere annoyance or unhappiness; and (3) the defendant had an extreme emotional reaction to it, as a result of which there was a loss of self-control, and reason was overborne by extreme intense feeling, such as passion, anger, distress, grief, excessive agitation or other similar emo-

tions. *State* v. *Elliott,* 177 Conn. 1, 9, 411 A.2d 3 (1979). Because Selig's testimony was directed to the defendant's capacity for self-control, the defendant maintains that it tended to disprove the existence of the third of these criteria. He thus argues that Selig's testimony amounted to an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the defense of extreme emotional disturbance in violation of § 54-86i.

The defendant, however, mischaracterizes the three criteria set forth in *Elliott* as "elements" of the affirmative defense of extreme emotional distress. Section 53a-54a describes the two elements of that defense as: (1) the defendant committed the offense under the influence of extreme emotional disturbance; and (2) there was a reasonable explanation or excuse for the defendant's extreme emotional disturbance. When we adopted the three criteria set forth in *Elliott,* we did not rewrite § 53a-54a, nor did we substitute our own "elements" for those specified by the legislature. We merely interpreted the meaning of the phrase "extreme emotional disturbance," and as we explained in *Elliott,* enumerated "understandable guidelines" for "instructing a jury" in determining the presence or absence of that mental condition. See *State* v. *Elliott,* supra, 8–9. These guidelines also serve to focus the presentation of evidence on three factual bases that we have deemed essential to support the inference that a defendant suffered from extreme emotional disturbance at a particular time. They are neither conclusive nor exclusive, however, for "[i]n the final analysis . . . the ultimate determination of the presence or absence of extreme emotional disturbance [is] one of fact for the trier, aided by expert testimony of both sides, but left to its own factual determinations." *State* v. *Zdanis,* 182 Conn. 388, 395, 438 A.2d 696 (1980), cert. denied, 450 U.S. 1003, 101 S. Ct. 1715, 68 L. Ed. 2d 207 (1981).

Moreover, in construing § 54-86i narrowly, we have assumed that the legislature enacted the statute to accomplish a reasonable and rational result. See *King* v. *Board of Education,* 203 Conn. 324, 332–33, 524 A.2d 1131 (1987). A broad construction of the statute, taken to its extreme, would arguably bar experts from fully testifying to their diagnoses of a defendant and to their resulting professional opinions, from which the jury could infer the defendant's state of mind at the time of a particular act. Jurors would thus be left without adequate expert assistance in making an informed decision upon the ultimate issue of the defendant's mental state, the precise issue expressly reserved to them by § 54-86i. Additionally, a defendant's ability to prove affirmative defenses involving mental state would be severely curtailed. Consequently, we do not believe that the legislature intended to proscribe expert opinion testimony with respect to a defendant's mental state so strictly as to render it an ineffective aid to the jury, or to eclipse the role of expert opinion testimony in substantiating a defendant's claim to have suffered from a certain mental condition at the time of an act alleged to be criminal in nature.

Therefore, in the present case, § 54-86i proscribed expert opinion testimony only with respect to whether the defendant was under the influence of extreme emotional disturbance at the time he killed Kelly. See General Statutes § 53a-54a. Since the state's questions neither called for nor elicited Selig's expert opinion as to whether the defendant was under the influence of extreme emotional disturbance at the time he killed Kelly, we hold that the questions and the resulting testimony did not violate § 54-86i. Thus, the trial court did not abuse its discretion when it overruled the defendant's objections to the state's questions.

The judgment is affirmed.

In this opinion the other justices concurred.